## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| FLORIDA HEALTH SCIENCES | : | | |
| CENTER, INC., d/b/a TAMPA | : | | |
| GENERAL HOSPITAL, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 19-3487 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 49, 55 |
| | : | | |
| XAVIER BECERRA,[1] | : | | |
| Secretary of Health and Human | : | | |
| Services, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

**DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

A coalition of hospitals ("Plaintiffs") challenge a 2013 Medicare payment-related rule issued by the Secretary of the Department of Health and Human Services ("the Secretary") following this Court's vacatur of an earlier 2004 rule on the same topic. Plaintiffs allege that the 2013 Rule was promulgated in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701–06 in that the Secretary failed to engage in reasoned decisionmaking. Plaintiffs contend that the rule was arbitrary and capricious because the Secretary failed to acknowledge that the rule constituted a change in agency policy, because the rule did not consider the significant financial consequences of the policy change on safety-net hospitals, and because the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Becerra is automatically substituted for former Acting Secretary Norris Cochran.

Secretary failed to adequately respond to comments about the agency's purportedly inconsistent interpretation of a statutory phrase. Currently pending before the Court are the parties' cross-motions for summary judgment. For the reasons below, the Court will grant the Secretary's cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

## II. BACKGROUND

### A. Statutory and Regulatory Background

#### 1. The Medicare Program

Medicare is a federal program designed to provide health insurance benefits to the elderly and disabled. *See* 42 U.S.C. §§ 1395 *et seq*. While the extremely complex statute[2] has five distinct parts, it is only Medicare Part A and Medicare Part C that are relevant to this action. Medicare Part A provides medical services to Medicare beneficiaries, *see id.* §§ 1395c–1395i–5, who consist of individuals age 65 and older who are entitled to monthly Social Security benefits under the statutory criteria. *See* 42 U.S.C. § 426(a). Under Medicare Part A, the government makes payments directly to healthcare institutions such as hospitals and other providers to cover the cost of services to the beneficiary. *See id.* §§ 1395f(a)-(b), 1395x(u). This typically occurs at predetermined rates as quantified under the Part A inpatient hospital prospective payment system. *See id.* § 1395ww(d). In contrast, Medicare Part C provides an alternative option for Medicare beneficiaries that differs from Medicare Part A's fee-for-service model. *See id*. §§ 1395w–21 to 1395ww–28. Under Medicare Part C, also known as the "Medicare + Choice" or "M+C program," beneficiaries "may elect to receive benefits through either the existing Medicare fee-for-service program or a Part C M+C plan." 63 Fed. Reg. 34,968, 34,968 (June 26,

---

[2] The Medicare statute has been described as "among the most completely impenetrable texts within human experience." *Allina Health Sys. v. Sebelius,* 982 F. Supp. 2d 1, 3 n.1 (D.D.C. 2013) (quoting *Rehab. Ass'n v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994).

1998).  In short, Medicare Part C allows an individual who is entitled to benefits under Medicare Part A to, if they so choose, receive benefits instead through a health maintenance organization ("HMOs"), preferred provider organization, or other private managed care plans.

## 2. Disproportionate Share Hospital Adjustment

Medicare provides hospitals who treat a large proportion of low-income patients an adjustment, known as the disproportionate share hospital ("DSH") adjustment, to the standard Medicare Part A predetermined rates.  *See* 42 U.S.C. 1395ww(d)(5)(F)(i).  The DSH adjustment is designed to compensate hospitals, such as Plaintiffs here, for the higher-than-average costs typically thought to be incurred for treating low-income patients.  *See Catholic Health Initiatives Iowa Corp. v. Sebelius,* 718 F.3d 914, 916 (D.D.C. 2013) (noting that the adjustment "is based on Congress's judgment that low-income patients are often in poorer health, and therefore costlier for hospitals to treat.").[3]  In order to qualify for a DSH adjustment, a hospital's disproportionate patient percentage ("DPP") must be calculated, which determines both a hospital's DSH eligibility as well as the payment amount.  *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(i), (iv), (v), (vii)–(xiii).  In essence, the DPP acts as a "proxy measure" for quantifying "the number of low-income patients a hospital serves." *Northeast Hosp. Corp. v. Sebelius,* 657 F.3d 1, 3 (D.C. Cir. 2011).

A hospital's DPP is defined as the sum of two fractions—the Medicare fraction, and the Medicaid fraction.  *See* 42 U.S.C. 1395ww(d)(5)(F)(vi).  The Medicare fraction seeks to determine the number of Medicare patients that a hospital serves that are also low-income, and it

---

[3] The Court does note that in the Patient Protection and Affordable Care Act ("ACA"), Congress concluded that the full DSH adjustment overcompensated eligible hospitals for treating low-income patients, and went on to reduce these payments by 75%.  *See* ACA, Pub. L. No. 111-148 3133, 124 Stat. 199 (Mar. 23, 2010).

uses an entitlement to Supplemental Security Income ("SSI") benefits as a proxy for low-income status. *See id.* § 1395ww(d)(5)(F)(vi)(I). The Medicare fraction is thus determined by dividing the number of patient days a hospital logs caring for Medicare Part A entitled patients who are also entitled to SSI benefits, by the total number of patient days the hospital spent caring for all patients entitled to benefits under Medicare Part A. *See id.; see also Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) (explaining Medicare fraction formula) ("*Allina II*").

The second, "Medicaid fraction" operates as a method of determining the hospital's low-income non-Medicare patient days, using Medicaid eligibility as a proxy for low-income status. The Medicaid fraction is calculated by dividing the number of patient days the hospital spent caring for Medicaid-eligible patients who are *not* entitled to benefits under Medicare Part A, by the hospital's total patient days for the period at issue. *See* 42 U.S.C. 1395ww(d)(5)(F)(vi)(II).

A visual representation of the two fractions may assist the reader in understanding these two concepts, particularly given what has been characterized as the "downright byzantine" language of the statute that sets out this regime. *Catholic Health*, 718 F.3d at 916.

|  | **Medicare fraction** | **Medicaid fraction** |
|---|---|---|
| Numerator | Patient days for patients "entitled to benefits under part A" and "entitled to SSI benefits" | Patient days for patients "eligible for [Medicaid]" but not "entitled to benefits under part A" |
| Denominator | Patient days for patients "entitled to benefits under part A" | Total number of patient days |

Once the two fractions are calculated, they are added together to calculate a hospital's total DPP percentage. A higher DPP leads to a larger DSH adjustment, and thus a greater reimbursement rate for the hospital. *Id.* at 916. The interpretative question in dispute—that has also been the focus of over a decade of related litigation— is whether the phrase "entitled to

benefits under Part A" in the numerator of the Medicare fraction should include patients that are eligible for Medicare Part A, but have chosen to enroll in Medicare Part C plans.

## B. Case Background

### 1. The 2004 Rule and Resulting Litigation

Prior to 2004, while there was no official rule on this issue of statutory interpretation, in practice the Department of Health and Human Services ("HHS") construed the term "entitled to benefits under Part A" in the Medicare DSH fraction to exclude patients who elected to join a Medicare Part C plan instead of the original Medicare Part A fee-for-service model. *See Allina I*, 746 F.3d at 1106 ("Prior to 2003, the [HHS] Secretary treated Part C patients as not entitled to benefits under Part A."). In 2003, the agency sought to clarify this position and proposed a rule stating that Part C hospital days would be included in the Medicaid—not Medicare— fraction, in effect codifying what had been standard agency practice up until this point. *See* 68 Fed. Reg. 27,154, 27, 208 (May 19, 2003) (proposed rule noted that "once a beneficiary has elected to join a [Part C] plan, that beneficiary's benefits are no longer administered under Medicare Part A."). However, after public comment, the Secretary reversed course and issued a rule stating that Part C days must instead be included in the Medicare faction. *See* 69 Fed. Reg 48,916, 49, 099 (Aug. 11, 2004) (the "2004 Rule"). The Secretary defended this policy reversal by arguing that Part C beneficiaries should be included in the Medicare fraction because "they are still, in some sense, entitled to benefits under Medicare Part A." 69 Fed. Reg. 48,765, 49,099.

The 2004 Rule has been subject to extensive litigation. The D.C. Circuit first blocked the agency's attempt to apply the 2004 Rule retroactively in *Northeast Hospital,* 657 F.3d at 17. The 2004 Rule was ultimately vacated on the grounds that it was not a "logical outgrowth" of the proposed rule, that HHS failed to explain the change from its prior practice, and that the

explanation for the final rule was inadequate—each an independent basis for finding the rulemaking arbitrary and capricious. *See Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 89–95 (D.D.C. 2012) ("*Allina I*"). This finding was affirmed by the D.C. Circuit, *see* 746 F.3d at 1111, though the court declined to reach the issue of the reasonableness of the agency's decision making, affirming solely on the grounds that the 2004 Rule was not a "logical outgrowth" of the proposed rule such that notice and comment was not properly provided. *Id.*

### 2. The 2013 Rule at Issue

Following the vacatur of the 2004 Rule in *Allina I*, but while the agency's appeal was still pending, HHS issued a notice of a new rulemaking with the aim of readopting the 2004 Rule's statutory interpretation of the phrase "entitled to benefits under Part A." *See* 78 Fed. Reg. 27,486, 27,578 (May 10, 2013) (noting that the agency was acting in an "abundance of caution" in case vacatur was affirmed). In August of 2013, this new rule was finalized. *See* 78 Fed. Reg. 50,496-01, 50,614-50,620 (Aug. 19, 2013) (the "2013 Rule"). HHS justified its re-adoption of the 2004 Rule's statutory interpretation by stating, "[w]e continue to believe that individuals enrolled in [Part C] are 'entitled to benefits under [Medicare] Part A' as the phrase is used in the DSH provision." 78 Fed. Reg. 50,614 (citing 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)). The agency then went on to justify this interpretation based upon an analysis of the statutory provisions at issue, *id.,* as well as engaging with concerns raised by various commenters, *id.* at 50,616-50,620. The 2013 Rule is what Plaintiffs now challenge in this action.

### 3. The Present Challenge

Plaintiffs in this case are more than thirty different hospitals, many of whom are the same plaintiff hospitals that have previously challenged different forms of this rule in the *Allina I* and *Allina II* litigation. This case was originally filed on August 25, 2017, after Plaintiffs exhausted

their administrative remedies. *See* Comp., ECF No. 1. On November 4, 2019, the Court

consolidated counts I and II of the original action with other similar, pending cases, while

leaving behind the count from the original complaint that challenged the 2013 Rule. *See* Order,

*In re Allina II-Type DSH Adjustment Cases*, No. 19-mc-190, ECF No. 1 at 8. Plaintiffs ask the

Court to issue an order declaring the 2013 Rule invalid and to enjoin the application of the rule to

any calculations of Medicare DSH payments that have occurred on or after October 1, 2013. *See*

Fifth Am. Compl. ("FAC") ¶ 4, ECF No. 52. Currently pending before the Court are the parties'

cross-motions for summary judgment. *See* Pls.' Mem. of P. & A.'s in Supp. of Mot. for Summ. J.

("Pls.' MSJ."), ECF No. 49; Defs.' Cross-Mot. for Summ. J. ("Defs.' MSJ."), ECF No. 55.

### III. LEGAL STANDARD

A court typically must grant summary judgment when the pleadings and evidence show

that "there is no genuine dispute as to any material fact and [that] the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases involving review of agency action

under the APA, however, Rule 56 "does not apply because of the limited role of a court in

reviewing the administrative record." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F.

Supp. 2d 13, 21 (D.D.C. 2011) (citations omitted). In this context, summary judgment instead

"serves as a mechanism for deciding, as a matter of law, whether the agency action is supported

by the administrative record and is otherwise consistent with the APA standard of review." *Id.* [4]

Under the APA, a court must "hold unlawful and set aside agency action, findings, and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[4] A court's review is also limited to only "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1907 (2020) (internal quotations and citation omitted). As a result, post-hoc explanations for agency action cannot be considered.

accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). Agency action is arbitrary and capricious if the agency (i) "has relied on factors which Congress has not intended it to consider"; (ii) "entirely failed to consider an important aspect of the problem"; (iii) "offered an explanation for its decision that runs counter to the evidence before the agency"; or (iv) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In short, an agency must "articulate a satisfactory explanation for its action" with a "rational connection between the facts found and the choice made." *Id.* In order to comply with this requirement, when an agency's action "depart[s] from established precedent," the agency must "acknowledge and provide an adequate explanation" for the change. *Dillmon v. Nat'l Tranp. Safety Bd.,* 588 F.3d 1085, 1089–90 (D.C. Cir. 2009); *see also F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (explaining that an agency must "display awareness that it is changing position" and cannot "depart from a prior policy *sub silentio*."). In addition, agencies "must respond in a reasoned manner to [comments] that raise significant problems." *Reytblatt v. U.S. Nuclear Regulatory Comm'n,* 105 F. 3d 715, 722 (D.C. Cir. 1997).

That said, the scope of the court's review is narrow, and a court cannot "substitute its judgment for that of the agency." *State Farm,* 463 U.S. at 43. Indeed, an agency's decision is presumed to be valid. *See Am. Radio Relay League, Inc. v. F.C.C.*, 617 F.2d 875, 879 (D.C. Cir. 1980). Furthermore, in Medicare cases, the "tremendous complexity of the Medicare statute . . . adds to the deference which is due to the Secretary's decision." *Dist. Hosp. Partners, L.P. v. Burwell,* 786 F.3d 46, 60 (D.C. Cir. 2015) (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994). Accordingly, the burden rests with the plaintiff to show

that an agency's decision is inconsistent with the APA. *Envtl Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 n.28 (D.C. Cir. 1981).

## IV. ANALYSIS

### A. Plaintiffs' Challenges to the 2013 Rule

Plaintiffs have moved for summary judgment, contending the 2013 Rule must be invalidated as a failure of HHS to engage in reasoned decision-making on three grounds. *See* Pls.' MSJ at 23–25. First, Plaintiffs contend that the 2013 Rule was arbitrary and capricious because HHS failed to both acknowledge and explain the agency's reasoning for its change in policy regarding the treatment of Medicare part C days. *Id.* at 24, 25–33. Second, Plaintiffs argue that HHS acted in an arbitrary and capricious manner by failing to consider a key "important factor" during the rulemaking process—the rule's "enormous adverse financial impact on safety-net hospitals." *Id.* at 24; *see also id.* at 33–42. Third, Plaintiffs posit that the 2013 Rule is also arbitrary and capricious because HHS failed to meaningfully address comments regarding an alleged inconsistency with the rule's interpretation of the phrase "entitled to benefits." *Id*. at 25, 42–44. The Secretary contests each of the Plaintiffs claims and has moved for cross-summary judgment. *See generally* Def.'s MSJ. The Court considers each challenge to the 2013 Rule in turn.

### 1. The Secretary Adequately Acknowledged and Explained Changes in Agency Policy Regarding the Calculation of Medicare Part C Days

Plaintiffs begin their attack on the 2013 Rule by arguing that the rule is necessarily arbitrary and capricious due to the HHS's failure to acknowledge and provide an adequate explanation for the agency's policy change regarding the calculation of Part C days in the DSH statute formula. Pls.' MSJ at 25. In response, the Secretary makes two arguments. First, he

asserts that the 2013 Rule was not actually a change in the department's policy, meaning the agency had no obligation to explain anything. Def.'s MSJ at 16. Second, he contends that nonetheless, HHS complied with this requirement by properly acknowledging and explaining the history of the agency's treatment of Part C days. *Id.* at 19. Upon a review of the record, the Court will decline to hold the 2013 Rule arbitrary and capricious on this ground.

The law on this topic is clear. When an agency seeks to reverse course in an area of policy, it must first "display awareness that it is changing position" and then "show that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515; *see also Dillmon*, 588 F.3d at 1089–90 (indicating that an agency must "acknowledge and provide an adequate explanation for its departure from established precedent"). This requirement operates as a check on agency rulemaking by ensuring that an agency's "prior policies and standards are being deliberately changed, not casually ignored." *Dillmon*, 588 F.3d at 1089 (quoting *Ramaprakash v. FAA*, 346 F.3d 1121, 1124–25 (D.C. Cir. 2003). Consequently, an agency acts in an arbitrary and capricious manner when it "departs from a prior policy *sub silentio*" or if it "simply disregard[s] rules that are still on the books." *Fox Television,* 556 U.S. at 515. In addition to acknowledging the policy change, an agency is required to provide an adequate explanation for the shift away from past precedent. *Id.* This requirement is not particularly stringent, as an agency need not prove "that the reasons for the new policy are *better* than the reasons for the old one" simply that there are "good reasons for it. . . and that the agency *believes* it to be better." *Id.* at 515 (emphasis in original). However, a more detailed explanation can become necessary when the new policy "rests upon factual findings that contradict those that underly its prior policy," or if the "prior policy has engendered serious reliance interests." *Id.* (citing *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742 (1996)).

The Court begins by examining a crucial threshold issue: whether the 2013 Rule was a departure from HHS precedent such that the agency had an obligation to acknowledge and explain the change in the rule. The parties devote a substantial portion of their briefs to a complex and, at times, convoluted discussion of this issue. Plaintiffs begin by positing that the 2013 Rule was a change from HHS's "pre-2004 policy and practice." Pls.' MSJ at 26. In support of this argument, they draw on one of the many earlier court decisions from this ongoing dispute, citing the D.C. Circuit's decision in *Northeast Hospital* that concluded that the 2004 Rule "contradict[ed] [HHS's] former practice of excluding [Part C] days from the Medicare fraction." 657 F.3d at 16–17 (alterations added); *see also Allina I*, 746 F.3d at 1108 (reiterating that in *Northeast Hospital* the court "explicitly stated that the Secretary did have a prior [pre-2004] practice of excluding Part C days from the Medicare fraction"). The Secretary responds, in short, by contending that any pre-2004 HHS policy or practice is irrelevant given that it is the 2013 Rule that is at issue here.[5] He argues that the 2013 Rule does *not* constitute a change in policy precisely because it sets forth "exactly the same interpretation as the 2004 Rule, promulgated nearly a decade earlier." Def.'s MSJ at 16. Indeed, HHS made this argument in the 2013 Rule itself, when responding to commenters who raised this issue. *See* 78 Fed. Reg. 50,620 ("Our proposed rule did not propose a change in policy, but rather to readopt a policy that we finalized in the FY 2005 final rule."). Plaintiffs then claim that the Secretary cannot rely on the 2004 Rule to claim the policy change had already been made, given that the 2004 Rule was

_____

[5] The Court notes the 2013 Rule stated, in response to commenters who contended otherwise, that it was not "a reversal of prior policy" because, before the 2004 rulemaking, there was "[n]o final regulation, administrative decision, or subregulatory guidance" issued regarding the treatment of part C days. 78 Fed. Reg. at 50,618. The Secretary also stated in its briefing to the Court that even if the pre-2004 HHS practice somehow amounted to an agency policy, "it would not support plaintiffs' claim that promulgation of the 2013 Rule nearly ten years later reflected a change in policy. . ." Def.'s MSJ at 16–17.

previously vacated on procedural grounds. Pls.' MSJ at 29 (contending that vacatur of 2004 Rule "reinstated the pre-2004 policy and practice"). The Secretary argues in response that the vacatur of the 2004 Rule is irrelevant, given that HHS's internal position—regardless of the legal effect of any regulations on the books— had been consistent since at least 2004. Def.'s MSJ at 18. This final disagreement—regarding if prior agency precedent is limited to only in-effect rules when evaluating an agency's obligations under *Fox Television,* appears to be an issue of first impression in this Circuit. Ultimately, the Court concludes that it need not reach this question, because even assuming without deciding that the 2013 Rule did indeed constitute a change in HHS's policy, the Court finds that HHS both demonstrated an awareness of the policy shift and provided a reasonable explanation such that the 2013 Rule was not arbitrary and capricious on this ground.

As already discussed, prior to promulgating a rule that will break with agency precedent, an agency is required to demonstrate an "awareness" of any changes in policy. *Fox Television*, 556 U.S. at 515. This "core requirement" requires that an agency "'provide [a] reasoned explanation for its action,' which 'would ordinarily demand that it display awareness that it is changing position.'" *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (quoting *Fox Television,* 556 U.S. at 515); *see also Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 156 (D.C. Cir. 2005) ("A statutory interpretation . . . that results from an unexplained departure from prior [agency] policy and practice is not a reasonable one."). Plaintiffs argue that the Secretary could not have met this "core requirement" given what they characterize as the agency's "head-in-the-sand" approach, *see* Pls.' MSJ at 26, and continued insistence that the 2013 Rule remained "consistent with [HHS's] longstanding policy" and should not be "considered a change in our policy." 78 Fed. Reg. at 50,620. Plaintiffs argue that this position is

foreclosed by the D.C. Circuit's finding that prior to 2004, HHS had a "practice of excluding [part C] days from the Medicare fraction." *Northeast*, 657 F.3d at 16–17; Pls.' Reply in Support of Mot. for Summ. J. and Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pls.' Reply") at 9–10, ECF No. 58. They also assert, without any real support, that "[i]t is not enough for the agency's 2013 [R]ule to have addressed a pre-2004 practice"—instead, they insist that the Secretary admit that prior to 2004 there was both a "practice *and* policy of excluding part C days." Pls.' Reply at 9 (emphasis added).

The Court will decline to find that the 2013 Rule was arbitrary and capricious due to the Secretary's failure to concede that the amended rule was a formal change in agency policy, given his extensive acknowledgement of past agency precedent through informal practice. A refresher as to the purpose of these "core" requirements is useful to understanding this point. The purpose of the *Fox Television* acknowledgement and explanation requirement is simple: it operates to ensure that when an agency engages in a rulemaking to reverse a prior practice or policy, the agency makes a conscious choice to depart from its past decisions, *Fox Television,* 556 U.S. at 515, and that "prior policies and standards are being deliberately changed, not casually ignored." *Dillmon*, 588 F.3d at 1089 (citing *Ramaprakash v. FAA*, 346 F.3d 1121, 1124–25 (D.C. Cir. 2003). Plaintiffs cannot reasonably contend that the Secretary ignored or inadvertently changed HHS precedent regarding the treatment of Medicare Part C days for the DSH calculation in the 2013 Rule. The 2013 Rule engaged in an in-depth recounting of HHS's policy and practice regarding the treatment of Part C days dating all the way back to1990, and acknowledged that prior to 2004, as a matter of informal practice, "Medicare Part C days were largely not included in the DSH calculation at all." 78 Fed. Reg. at 50, 619. Indeed, the 2013 Rule also goes on to state that "we acknowledge that . . . the DC Circuit held in *Northeast* that the agency had a

practice of excluding [Medicare Part C] days from the Medicare fraction prior to the [2004 Rule]." *Id.* at 50,618.[6] The 2013 Rule then continues on to provide a variety of reasons explaining why HHS believes the new interpretation to be the better policy. If the purpose of the acknowledgement requirement is to ensure that an agency undertakes a "conscious change of course" such that the agency truly believes the new policy is a better course of action than the old, HHS has accomplished that here. *See Cablevision Sys. Corp. v. F.C.C.*, 649 F.3d 695, 710 (D.C. Cir. 2011) (rejecting challenge that agency departed from its precedent without acknowledgement where agency took "care. . . to explain its prior actions" such that there was "no basis" to conclude that it "'casually ignored' prior policies and interpretations or otherwise failed to provide a reasoned explanation for its order.") (citing *Dillmon*, 558 F.3d at 1089).

The *Health Alliance Hospitals, Inc. v. Burwell* court's holding on this very issue is instructive. In *Burwell*, the Secretary refused to "concede that the amended rule was a 'change' from prior policy" as plaintiffs contended, and maintained that it was only a "'clarification' of its pre-existing policy." 130 F. Supp. 3d 277, 301 (D.D.C. 2015). The Secretary had, however, acknowledged that in the past some hospitals and even certain court decisions had interpreted the current policy in contradictory ways. *Id.* The *Burwell* court concluded that the awareness prong had been met even without a formal admission that the policy had been changed, noting that "the Secretary's acknowledgment of prior alternative policy interpretations meets the 'core requirement' of rulemaking, especially in light of the fact that the Secretary [went] on to fully explain her reasons for the policy that she sought to clarify through the rulemaking." *Id.* For

---

[6] Plaintiffs note in their own explanation of the operative legal rule that, "[HHS] needed to acknowledge that its proposed "readoption," while consistent with the vacated 2004 rule, represented a marked departure from the operative pre-2004 standard." Pls.' Reply at 9. By the Court's judgment, Plaintiffs' own standard has been met here based on the Secretary's acknowledgement in the 2013 Rule described above.

similar reasons the Court finds the core requirement of awareness of past precedent to be present here. The Secretary did not "depart from a prior policy *sub silentio*," *Fox Television,* 556 U.S. at 515, but rather engaged in an analysis of the historical treatment of Medicare Part C days by the agency, acknowledging the agency's contradictory past practice and the relevant court decisions on the topic. This is more than sufficient to demonstrate an awareness of past agency practice, and to show that the policy endorsed in the 2013 Rule was consciously chosen even in light of this precedent. To require more from the agency—such as what essentially amounts to the legal concession Plaintiffs demand here—runs the risk of turning the rulemaking process into a method of extracting compliance with legal positions with which an agency may reasonably disagree. Consequently, the Court holds that the first *Fox Television* requirement is met.[7]

The 2013 Rule also easily meets the second requirement of the *Fox Television* analysis, as it provides a reasonable explanation regarding why the agency has chosen to adopt the specific statutory interpretation of "entitled to benefits under Part A" in the Medicare DSH statute. *See id.* When an agency departs from past policy, "[i]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* (emphasis in original). Each of these three requirements are present in the 2013 Rule. First, regarding if "good reasons" were provided, the Secretary devoted several paragraphs to this topic, conducting a statutory analysis of the relevant phrase and the overall Medicare

---

[7] Plaintiffs construct a strawman argument in an attempt to argue to the contrary, contending that "[i]f this Court were to accept the government's argument, an agency could always promulgate a rule that did not acknowledge a shift and then promulgate a new rule that purports to 'readopt' the shift in the earlier rule without *ever* having to acknowledge it . . . this cannot be the case." Pls.' Reply at 15 (emphasis in original). But this is not what has occurred here. Rather, as the Court has already explained, the Secretary acknowledged past agency practice that differed from the 2013 Rule and went on to explain why HHS believed the statutory interpretation espoused in the 2004 and 2013 Rule to be the better interpretation.

statute to conclude that its interpretation, that included Part C recipients as "entitled to benefits under Part A," "reflects the statutory language [of the DSH statute] and congressional intent." 78 Fed. Reg. at 50,619.[8]  Adhering to statutory language and congressional intent are certainly "good reasons" to support a particular agency policy.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (explaining that "an agency may justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies") (citation omitted); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007) (rejecting challenge to agency's explanation for rulemaking where agency had stated that its interpretation is "more consistent with statutory language").  This interpretation is also consistent with the statutory language (a conclusion the Plaintiffs do not dispute), and HHS clearly believes that this approach is the best policy, as evidenced by the decades of litigation the agency has undertaken to promulgate this interpretation of the statute.  Plaintiffs, in devoting nearly all their attention to the Secretary's purported lack of acknowledgement of the previous standard, only tangentially address this second requirement, arguing only that the agency "failed to acknowledge, let alone explain" the policy change.  Pls.' Reply at 13; *see also* Pls.' MSJ at 30.  But this assertion is plainly incorrect, as the Court has already detailed in both respects.[9]  While

---

[8]  HHS's support for the 2013 Rule interpretation relied on, *inter alia,*, that (1) the Medicare statute explicitly states that individuals are "entitled" to Medicare Part A when they meet specific statutory criteria; (2) that entitlement to Medicare Part A is a preliminary requirement to enrollment in Medicare Part C; and (3) the statute contained no indication of congressional intent for enrollment in Medicare Part C to bar an individual's statutory entitlement to benefits under Part A.  *See* 78 Fed. Reg. at 50,614–50,615 (engaging in analysis of different provisions of the Medicare statute, and noting specific Part A benefits in which Part C designees can partake).

[9]  While the Supreme Court has noted that a more robust explanation for an agency's policy change can be required when the new policy "rests upon factual findings that contradict those that underly its prior policy," or if the "prior policy has engendered serious reliance interests," *Fox Television,* 556 U.S. at 515 (internal citation omitted), Plaintiffs have not brought such an argument here.

clearly the Plaintiffs would have preferred that HHS had adopted an alternative reading of the phrase in question, the Court finds that the explanation is adequately "reasoned" for all of the reasons described above.

The Court concludes that by both acknowledging agency precedent and providing a reasoned explanation for its current action, the Secretary has met this "core requirement" for rulemaking. Accordingly, the 2013 Rule is not arbitrary and capricious on this ground.

2. **The Secretary's Treatment of the Fiscal Impact of the 2013 Rule Does Not Constitute a Failure to Consider an Important Aspect of the Problem**

Plaintiffs argue next that the 2013 Rule is "invalid because it 'entirely failed to consider an important aspect of the problem'"—namely, what Plaintiffs characterize as the rule's "enormous adverse financial impact on hospitals," Pls.' MSJ at 33–34 (quoting *State Farm,* 463 U.S. at 43), along with also violating the separate requirement to provide a fiscal impact analysis under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612. In response, the Secretary contends that because this rulemaking was primarily "an exercise in discerning congressional intent thorough the statutory text," policy factors such as the financial repercussions of the rule do not qualify as a relevant or important consideration that demand agency consideration prior to promulgation. Def.'s MSJ at 24. The Court agrees with the Secretary's conclusion.

As a reminder, "[n]ormally, an agency rule would be arbitrary and capricious if the agency has," *inter alia,* "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *see also Regents of the Univ. of Cal*., 140 S. Ct. at 1913 (noting that the failure to consider an important factor can, standing alone, render an agency decision arbitrary and capricious). Indeed, the D.C. Circuit has noted that this failure "is one of the hallmarks of arbitrary and capricious reasoning." *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430

(D.C. Cir. 2018). However, an agency is not required to consider all factors that may arise or be brought to its attention during the course of a rulemaking, but rather, must consider the "important" or "relevant" ones. *See State Farm,* 463 U.S. at 43; *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985). The key question here, therefore, is whether financial considerations were relevant to the 2013 Rule's statutory interpretation of the phrase "entitled to benefits under part A" in the Medicare fraction. *See City of Portland v. EPA*, 507 F.3d 706, 714–15 (D.C. Cir. 2007) (indicating that an agency need only respond to comments "'which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule'").

That the interpretation of the phrase "entitled to benefits under part A" codified in the 2013 Rule decreases the payments received by safety net hospitals compared to the pre-2004 standard is not seriously in dispute. As the D.C. Circuit explained all the way back in 2004 when this policy change first arose, "the practical consequences of [the Part C] dispute number in the hundreds of millions of dollars." *Northeast Hosp.*, 657 F.3d at 5; *see also Allina I,* 746 F.3d at 1105, 1107 (noting that the 2004 Rule change had "enormous financial consequences" for the Plaintiff hospitals). Indeed, at oral argument before the D.C. Circuit in an earlier iteration of this case contesting the 2004 Rule, government counsel conceded that the amount "at stake" was "probably" in the "hundreds of millions of dollars." Oral Argument Tr. at 10–20, *Allina I*, No. 13-5011 (D.C. Cir. Feb 7, 2014); *see also Azar v. Allina Health Services,* 139 S. Ct. 1804, 1809 (2019) (referencing the government's representation that including Part C patients in the Medicare fraction "makes the fraction smaller and reduces hospitals' payments considerably—by

between $3 and $4 billion over a 9–year period.").[10]  Accordingly, Plaintiffs argue that the

Secretary acted in an arbitrary and capricious manner by declining to "grapple[] with the fact that

this policy change reduces DSH payments to safety-net hospitals" by these quite substantial

amounts.  Pls.' MSJ at 35.  The Secretary raises two arguments to support his contention that

such an analysis was unnecessary.  First, the Secretary claims that it did address this concern in

the text of the 2013 Rule itself, where it noted that, "[b]ecause this proposal is consistent with

our longstanding policy," there would not "be additional savings or costs to the Medicare

program, and by inference, to hospitals, as a result[.]" 78 Fed. Reg. at 50,620.  Second, the

Secretary contends that even disregarding this response, the issue of the financial impact of the

rule was not so "important" to the rulemaking that the failure to weigh it renders the resulting

rule arbitrary and capricious, because the "agency and commenters alike approached the Part C

question as an interpretative problem susceptible to resolution by reference to the statutory text,

structure, and legislative history."  Def.'s Reply in Further Supp. of Def.'s Mot. for Summ. J.

("Def.'s Reply") at 10, ECF No. 60; Def.'s MSJ at 25–27.  Unsurprisingly, Plaintiffs take issue

with both arguments.  The Court evaluates each in turn.

*a. The Secretary's Factual Conclusion Regarding the Financial Impact of the 2013 Rule Was*

*Supported by Substantial Evidence*

First, there is no dispute that the Secretary did indeed address the question of the financial

repercussions of the 2013 Rule in response to commenters who raised this issue.  The Secretary

---

[10] Plaintiffs do acknowledge that the ACA reduced DSH payments by 75% beginning on October 1, 2013, as the Government shifted to subsidizing hospitals through uncompensated care payments.  Pls.' MSJ at 39 (citing 42 U.S.C. § 1395ww(r)).  However, Plaintiffs argue that the adverse financial impact they face as a result of the 2013 Rule's interpretation is still substantial, particularly in light of the increasing enrollment of patients in Medicare Part C, and overall increase in Medicaid post-2013 due to the ACA Medicaid expansion.  *Id.* at 39 n. 17.

explained that, "[b]ecause this proposal is consistent with our longstanding policy," there would "be [no] additional savings or costs to the Medicare program, and by inference, to hospitals, as a result[.]" 78 Fed. Reg. at 50,620. Plaintiffs argue, however, that this contention was "not only unsupported and unexplained," but also "rest[ed] upon a factual premise that is unsupported by substantial evidence." Pls.' MSJ at 40. Accordingly, they urge the Court to find that the 2013 Rule is arbitrary and capricious on this ground. *Id.* at 41. The Court will decline to do so.

When an agency action is "bound up with a record-based factual conclusion" the reviewing court is tasked with determining if the agency's conclusion is supported by "substantial evidence." *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999). If it is not, the action can properly be classified and set aside as "arbitrary and capricious." *Id.* In applying this standard, however, a reviewing court cannot "displace . . . [a] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Instead, the court must ask, "whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." *Dickinson,* 527 U.S. at 164 (citation and internal quotation marks omitted). The Court finds that the Secretary's position here is supported by sufficient evidence such that a reasonable mind could accept it.

The factual conclusion at issue is the Secretary's statement that "[b]ecause [the 2013 Rule's interpretation of the Medicare fraction] is consistent with our longstanding policy," there would be no "additional savings or costs to the Medicare program, and by inference, to hospitals, as a result," 78 Fed. Reg. at 50,620. The Court finds that this statement is adequately supported by the evidentiary record. For the agency did have a "longstanding policy" supporting this interpretation: this same statutory interpretation had been adopted in the agency's 2004 Rule and

CMS regulations were accordingly amended in this regard in 2007. *Id.* at 50,614. Consequently, a reasonable mind could conclude that the interpretation again codified in the 2013 Rule has been HHS policy for several years at minimum, rendering it a suitably "longstanding" policy of the agency. *See e.g.,* FAC ¶ 24 (noting that by July of 2009, HHS included Part C days in the Medicare fraction). As a result, the Court finds the Secretary's explanation to be adequately supported by substantial evidence, as required.

Plaintiffs, however, argue to the contrary, contending that this factual proposition is false as a result of HHS "measur[ing] the financial impact from the wrong baseline: the vacated 2004 rule instead of the reinstated pre-2004 rule." Pls.' Reply at 17. But this is not the fatal blow that Plaintiffs seem to think it to be. Certainly, a more robust discussion of the intricacies of the vacatur of the 2004 Rule could have provided a more complete ventilation of the issue, but this does not mean that the agency's statement that the 2013 Rule "was consistent with [HHS's] longstanding policy" and consequently would have limited "additional savings or costs" was contrary to the evidence before the agency. 78 Fed. Reg. at 50,620. As already detailed, the history of the policy is not seriously in dispute, and while the vacatur of the 2004 Rule did operate to strip the rule of its legal effect, it did not magically erase this history, of which all of the interested parties were certainly aware. This is particularly true given that at the time the 2013 Rule was drafted, the agency was still appealing the vacatur of the 2004 rule, meaning this decision was not yet final. Furthermore, Plaintiffs provide no other evidence, aside from the fact that the 2004 Rule had been vacated, to undermine this factual conclusion.[11] In short, the

---

[11] Plaintiffs cite various decisions describing how the 2004 Rule change would have significant financial impacts on safety net hospitals. *See* Pls.' MSJ at 35 (collecting cases). But HHS does not argue to the contrary. Indeed, they simply conclude that the 2013 Rule would maintain the status quo established in the 2004 Rule. Accordingly, nothing about the agency's conclusion is undermined by this evidence.

Secretary's explanation was not so false that a reasonable mind would be required to reject the conclusion reached based on the available evidence, as the agency's "conclusions [were] within the range of those that a reasonable person could derive from the evidence presented." *Peck,* 751 F.2d at 1370.

### b. The Financial Implications of the 2013 Rule Were Not an Important or Relevant Consideration to the Rulemaking

Even ignoring, for the moment, that the Secretary did indeed address the financial implications of the 2013 Rule, the Secretary also argues that the agency did not need to delve into this analysis at all because this issue was not an important aspect of the problem the agency was tasked with addressing. The 2013 Rule explicitly states that the "relevant" question at issue is "how to interpret the phrase 'entitled to benefits under part A'" using "statutory language and "congressional intent." 78 Fed. Reg. at 50,619. As a result, the Secretary proceeded by examining the statutory criteria for those that are entitled to Medicare Part A, noting that under 42 U.S.C. (a)(1)(B)(i) "a beneficiary must be entitled to Part A to be enrolled in Part C." Def.'s MSJ at 26 (citing 2013 Rule, 78 Fed. Reg. at 50,614). The Secretary also recounted the history and purpose of the Medicare fraction and other related statutory provisions. 78 Fed. Reg. at 50,619. Based on this review, he concluded based on these factors that individuals enrolled in Part C should be included in the Medicare fraction as they are "entitled to benefits under Medicare Part A." *Id.* 50,614. This approach was in line with the historical treatment by HHS of DSH-related questions, which tend to be resolved in a straightforward application of the general principles of statutory interpretation. *See, e.g., Edgewater Medical Center v. Blue Cross and Blue Shield Ass'n,* 2000 WL 1146601, at *4–*5 (addressing DSH calculation question by relying "on the plain language of the statute and the intent of Congress"); *In re Southwest Consulting*

*DSH Medicare + Choice Days Groups Provider*, No. 2010-cv-D52, 2010 WL 5571037, at *8 (Nov. 22, 2010) (interpreting Medicare DSH fraction "[b]ased on the plain language of the statute").

The Secretary maintains that, contrary to Plaintiffs' claims, HHS was not required to do more and engage with "free-floating policy considerations," such as the impact of its chosen interpretation on a hospital's overall DPP, Def.'s MSJ at 26 (citing *Bauer v. Marmara*, 942 F. Supp. 2d 31, 39 (D.D.C. 2013)), given that "[t]he quest for congressional intent usually begins and ends with the text and structure of the statute," *id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)). In essence, the Secretary contends that the financial implications of the 2013 Rule, as a factor outside the statutory interpretation process, could not be an "important" or "key" aspect of the problem. This conclusion is supported by the D.C. Circuit's holding in *Northwest Airlines, Inc. v. FAA,* which found that where an agency had reached a "reasonable" interpretation of the statute at issue, "nothing . . . compelled" the agency to go further and consider the potential economic harm of the decision. *Nw. Airlines, Inc. v. F.A.A*., 14 F.3d 64, 69 (D.C. Cir. 1994); *Pinter v. Dahl*, 486 U.S. 622, 654 (1988) (finding that where a legal issue was resolved on statutory grounds, the Court "need not entertain [plaintiff's] policy arguments"). Indeed, Judge Kavanaugh—when analyzing this same statutory phrase in *Northeast,* wrote in his concurrence that while "the legal question presented here. . . has significant financial ramifications, the question itself is straightforward" and "[t]he case boils down to a straightforward question of statutory interpretation." *Northeast*, 657 F.3d at 18–19 (D.C. Cir. 2011) (Kavanaugh, J., concurring).[12]

---

[12] While then-Judge Kavanaugh advocated for an alternative reading of the statutory phrase at issue, his conclusion further underscores that this issue can be resolved solely on the

In response, Plaintiffs raise a number of arguments as to why financial considerations were important to the rulemaking and were thus impermissibly disregarded. None are ultimately convincing. Plaintiffs begin with a contention that the financial repercussions of the rule needed to be addressed because the agency's interpretation, by lowering DSH payments, conflicts with congressional intent and the overall statutory purpose of the DSH adjustment. Pls.' MSJ at 36–37. They argue that the statute's intended purpose of compensating hospitals for their treatment of low-income patients is violated because the agency's chosen statutory interpretation reduces a hospital's DPP—and thus its reimbursement rates—compared to the pre-2004 level. Pls.' Reply at 19. While it is true that an agency's interpretive decision is to be rejected when it "conflict[s] with the policy judgments that undergird the statutory scheme," *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994), no such conflict appears to be present here. Plaintiffs simply reiterate that DSH hospitals would be paid less under this interpretation of the DPP formula calculation, but they have not claimed or put forth any evidence that HHS's preferred interpretation would underpay hospitals or otherwise not compensate them fairly for DSH-related costs—and thus violate the purpose of the DSH statute. Indeed, as the Secretary notes, a 2007 report found that hospitals were largely being *overcompensated* under the previous scheme for DSH-related costs. *See* Def.'s Reply at 11 n.7 (citing MedPac, Report to the Congress: Medicare Payment Policy at 68 (Mar. 2007)) (emphasis added). Consequently, there is no apparent discrepancy between the DSH statute's purpose and HHS's preferred statutory interpretation as codified in the 2013 Rule, nor does the selected interpretation lead to any other incongruous result. *See Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S.

---

basis of the statutory text and structure, without any need to engage in a consideration of the economic results of the policy.

164, 188 (1994) ("Policy considerations cannot override our interpretation of the text and structure of [a statute], except to the extent that they may help to show that adherence to the text and structure would lead to a result 'so bizarre' that Congress could not have intended it.") (alteration added).

Perhaps in recognition of the limitations of their original argument, Plaintiffs shift gears in their reply to argue that the financial impact of the 2013 Rule was a relevant consideration because HHS's chosen "interpretation of the DSH statute. . . was not compelled by the statute or congressional intent." Pls.' Reply at 16. While their initial premise is accurate—courts have previously recognized that "the phrase 'entitled to benefits under Part A' is ambiguous[,]" *Allina I,* 746 F.3d at 1106— they provide no relevant authority for their claim that because the agency was interpreting an otherwise ambiguous statute it *must* address policy concerns such as economic considerations.[13]  This is because an agency "may justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies," as has occurred here. *Encino Motorcars*, 136 S. Ct. at 2127.  And when interpreting an ambiguous statute, courts are to "defer" to an agencies' judgment, unless the outcome is "wholly unsupported or . . . conflict[s] with the policy judgments that undergird the statutory scheme." *Shalala*, 23 F.3d at 416; *see also Nw. Airlines, Inc*., 14 F.3d at 69 (noting that the court must "defer to an agency's reasonable interpretation of an ambiguous statute that it must administer") (citing *International Union, UMW v. Federal Mine Safety and Health Admin*., 920 F.2d 960, 963 (D.C. Cir. 1990)).  Here, the Secretary's interpretation is both sufficiently supported and in accord with congressional intent.  Consequently, this argument also has no merit.

---

[13] The single case cited by Plaintiffs in support of this assertion, *Stewart v. Azar,* 366 F. Supp. 3d 125 (D.D.C. 2019), is inapposite, as is discussed in more detail below.  *See infra* Section IV.II.b.

Plaintiffs also posit that the agency "simply ignore[d]" comments on this topic. Pls.'
Reply at 21; *see also* Pls.' MSJ at 35–36 (collecting comments). But the comments Plaintiffs
invoke simply reiterated that DSH payments would be reduced under the Secretary's intended
statutory interpretation, a fact that, as already discussed, fails to provide any rationale for why
this would violate the congressional intent of Congress who drafted the DPP formula in the first
place.[14] And an agency need only respond to comments "that raise significant problems," *City of
Waukesha v. E.P.A.*, 320 F.3d 228, 257–58 (D.C. Cir. 2003) (citations omitted), as "the failure to
respond to comments is significant only insofar as it demonstrates that the agency's decision was
not based on a consideration of the relevant factors," *Texas Mun. Power Agency v. EPA*, 89 F.3d
858, 876 (D.C. Cir. 1996) (citation and internal quotation marks omitted). As already discussed
in depth, none of these comments raised "significant problems" that attacked the statutory
analysis used by the Secretary to reach his interpretation of the DPP formula.

Plaintiffs also cite to select quotations from past decisions in this dispute and others to
argue that because "the Court of Appeals has observed on numerous occasions" that the Part C
interpretation issue has "major financial implications for safety-net hospitals," the agency must
have acted in error by failing to consider this factor. Pls.' Reply at 21. To the extent that
Plaintiffs mean to imply that precedent supports their contention that the financial ramifications
of the 2013 Rule are necessarily an "important aspect of the problem," this is plainly incorrect.

---

[14] Certain commenters, in identical comments, also requested that the Secretary provide
data on the "fiscal impact" of his interpretation, *see, e.g.,* Rulemaking Record ("RR") at 8, 23,
29, 170, 441, 959, 1228, 1243, ECF 61-1 to 61-3 (noting that "[t]he agency should . . . address
the fiscal impact of this policy change" and "release data as to whether this estimate [of hundreds
of millions of dollars] is correct and, if not, what the impact is"). Without a more targeted
request explaining the necessity of this information, the Court finds that the Secretary reasonably
responded to this request for the agency to address the fiscal impact of the rule by noting that the
interpretation used in the 2013 Rule did not differ from longstanding agency policy, and thus
would have a minimal financial impact. *See* 78 Fed. Reg. at 50, 620.

None of these decisions suggest that the financial implications of the 2013 Rule have a role to play in the Secretary's statutory interpretation of the Medicare fraction. Rather, the discussion of financial consequences in these opinions was limited to illustrating "the practical consequences of this dispute," *Northeast,* 657 F.3d at 4, the economic "stake[s] for the Government and the hospitals," *Allina II,* 863 F.3d 937, 939 (D.C. Cir. 2017), and to demonstrate why the Government's previous failure to adequately allow for a robust comment period was not harmless, *see Allina I,* 746 F.3d 1102, 1108 (noting that because the estimated financial impact numbered in the hundreds of millions of dollars, a more comprehensive call for comment "would doubtless have triggered an avalanche of comments").[15]

Nor does the Court find Plaintiffs' argument that simply because HHS is "no stranger to analyzing the financial impact of its rule changes," Pls.' Reply at 19–20, that such an analysis was required here. For "the parameters of the arbitrary and capricious standard of review will vary with the context of the case," *Dist. Hosp. Partners,* 786 F.3d at 56–57, and whether financial considerations are an important or relevant factor in a completely unrelated agency rulemaking is of limited import as to whether such an analysis was required here. Furthermore, as the Secretary accurately notes, *see* Def.'s Reply at 16, all of the examples Plaintiffs provide in

---

[15] Plaintiffs attempt to argue that the district court previously decreed that the Secretary "should have wrestled" with the financial impact of the predecessor 2004 Rule. Pls.' Reply at 16 (quoting *Allina I,* 904 F. Supp. 2d at 94). This is a stretch. The court made this statement in the context of a discussion of how the Secretary's "cursory explanation" justifying the agency's 2004 policy change under *Fox* was inadequate. *Allina I*, 904 F. Supp. 2d at 94. To support this assertion, the court noted how the agency had neglected to address comments regarding congressional intent, as well as the financial impact of counting Part C days in the Medicaid fraction. *Id.* In the Court's reading, this explanatory defect was highlighted not because it was necessarily an important consideration to the rulemaking, but because it was a potential "good reason" that could have justified the policy change. Regardless, as already discussed, the Secretary did address the financial impact of the 2013 Rule at issue here. *See supra* Section IV.II.a.

support of this claim pertain to rulemakings that involved policy decisions explicitly premised, at least in part, on financial concerns or where the agency was required under statute to conduct such a financial analysis. Neither scenario is applicable here.

Finally, Plaintiffs provide the Court with several cases that they contend demonstrate that the Secretary acted arbitrarily and capriciously by not considering the financial implications of the 2013 Rule. *See* Pls.' MSJ at 34; Pls.' Reply at 24. However, upon the Court's review, at most these cases stand for the uncontroversial proposition that where an agency relies on financial considerations to justify its policy choice or is otherwise statutorily required to engage in such an analysis, it must do so. Accordingly, each case provided can be distinguished from the circumstances at hand. For example, Plaintiffs invoke *Stewart v. Azar*, but this case held only that where the Secretary premised a policy decision on a rationale of "promot[ing] fiscal sustainability" it could not then go on to refuse to analyze or make a finding about "the savings that [the project] could be expected to yield." 366 F. Supp. 3d 125, 150 (D.D.C. 2019). In contrast, the 2013 Rule was premised upon the agency's statutory interpretation, not an economic policy goal. *Business Roundtable v. SEC* also provides little persuasive weight, given that the court concluded a financial analysis was required because the Securities and Exchange Commission's own organic statute mandated this step, *see* 647 F.3d 1114, 148–49 (D.C. Cir. 2011), a requirement that is not present here. Plaintiffs' remaining precedent is equally unavailing. The court in *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.* found that a rule was arbitrary and capricious where an agency had "largely ignored" the findings of its own extensive report on the problem in question, noting in dicta that this disregard was particularly "baffling" given that following the report's recommendations would provide "benefits far in excess of costs." 429 F.3d 1136, 1146–47 (D.C. Cir. 2005). No such report

existed in the instant case, and furthermore, because the Secretary was simply interpreting statutory language, financial considerations such as a cost-benefit analysis were not invoked as a justification for the policy. The decision in *Indep. U. S. Tanker Owners Comm. v. Lewis* also fails to provide any footing for Plaintiffs to argue financial considerations are relevant. The *Lewis* court concluded that an agency had "failed completely to fulfill its [APA] obligations" where it had relied on only a single-sentence justification for the rule, did not provide any response to the comments received, and also failed to provide any coherent statement of the rule's basis or purpose. 690 F.2d 908, 919–20 (D.C. Cir. 1982). The Court then continued on to editorialize that "[g]iven the substantial economic interests involved, both local and national, [the agency's] failure to act responsibly in this regard, in accordance with mandated procedures, is not only surprising, it is certainly to be deplored." *Id.* at 920. Consequently, it appears that it was the agency's more fundamental procedural failures that the court took issue with, rather than any failure to address the financial implications of the rule. Plaintiffs are therefore unable to muster *any* caselaw to support their argument that financial considerations are a relevant factor that the agency was required to address in the 2013 Rule.

The majority of Plaintiffs' arguments— at their core— can be reduced to a claim that because there is so much money on the line, financial considerations *must be* pertinent to the Secretary's final decision. But as the Secretary accurately notes, this "conflate[s] the sheer dollar figure at stake with substantive relevance." Def.'s MSJ at 31. The Secretary is charged with interpreting the statutory language of the DPP percentage, which Congress has already determined is the appropriate method by which to reimburse DSH hospitals. Because the Secretary's resulting interpretation is in accord with this congressional intent and does not result in an absurd outcome, the Court concludes that the potential financial implications of the 2013

Rule were not relevant to the agency's statutory analysis. Accordingly, the Court holds that Plaintiffs have failed to show, as is their burden, that the 2013 Rule was arbitrary and capricious on this basis.

*c. Plaintiffs Have Failed to Establish a Cause of Action to Bring Their Regulatory Flexibility*

*Act ("RFA") Claim*

Plaintiffs also argue that the Secretary's failure to analyze the financial implications of the 2013 Rule contravenes another statutory obligation of the agency. The RFA mandates that federal agencies consider the impact of their regulations on small entities. *See* 5 U.S.C. §§ 601–612. To this end, it requires agencies, when promulgating a final rule, to file a final regulatory flexibility analysis. *Id.* § 604(a). Plaintiffs claim that HHS "unreasonably disregarded the requirements of the RFA by failing to evaluate the effect of the 2013 Rule's part C days policy change on the DSH payment calculation." Pls.' MSJ at 41. The Secretary disputes this claim on both procedural grounds and on the merits, arguing that none of the Plaintiffs have plead facts to show they are a qualifying "small entity" such that they can invoke the RFA, that any possible RFA claims are time-barred, and that the Secretary did prepare a compliant regulatory flexibility analysis of the 2013 Rule. Def.'s MSJ at 34.

The Court begins with the threshold question of whether Plaintiffs have a cause of action to proceed under the RFA.[16] The statute provides that only "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance

---

[16] While the Secretary fashions his argument as one in which he contends Plaintiffs have failed to establish "standing to bring suit under the RFA," Def.'s Reply at 19, this issue is more properly framed as "a question of whether Plaintiffs have a cause of action under the statute." *See Silver v. Internal Revenue Serv.*, No. 19-cv-247, 2021 WL 1180081, at *12 (D.D.C. Mar. 28, 2021) (analyzing whether Plaintiffs qualify as small entities under the RFA) (citing *Lexmark Int'l Inc. v. Static Control Comp.*, 572 U.S. 118, 128 & n.4 (2014)).

with [RFA's final regulatory flexibility analysis mandate].'" 5 U.S.C. § 611(a)(1). A "small entity" is defined, in relevant part, as a "small organization," *id.* § 601(6), and a "small organization" is further defined as encompassing "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field," *id.* § 601(4). Plaintiffs claim that they accordingly fall within the RFA's zone-of-interests as they assert that they are composed of not-for-profit, hospital organizations. Pls.' Reply at 26.

But as the Secretary accurately points out, while Plaintiffs claim in their papers to fall within the statute's bounds, this is not the same as actually making the showing that they are small entities for the purposes of the RFA. Indeed, the amended complaint is devoid of even a pleading in this regard, much less the evidentiary proof required at this stage to withstand summary judgment. *See, e.g.*, *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 75 (D.D.C. 2013) (dismissing RFA claims where "Plaintiffs have not alleged [in their complaint] that they themselves are small entities covered by the RFA."); *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 235–36 (D.D.C. 2018) (dismissing RFA claim at summary judgment where plaintiffs' complaint contained "a single conclusory allegation" that they fell within the statutory definition of a small entity, and lacked any other factual support for claim). Consequently, Plaintiffs have failed to demonstrate that they fall within RFA's zone of interests, leaving them without a viable cause of action.[17] Having failed to make this threshold showing, the Court need proceed no further. Plaintiffs' RFA claim is dismissed.

_____

[17] The authorities Plaintiffs muster in an attempt to preserve their claim are unpersuasive. Plaintiffs cite first to the RFA analysis conducted in the 2013 and 2004 rulemakings at issue, where the agency had stated that "[w]e estimate that *most* hospitals. . . are small entities as that term is used in the RFA," and "[f]or purposes of the RFA, all hospitals . . . are considered to be small entities." *See* 2013 Rule, 78 Fed. Reg. at 51,038 (emphasis added). While the Secretary may have taken this stance for the purposes of analysis within each of these rulemakings, it is not enough to demonstrate that Plaintiffs in this case actually meet the statutory definition to be

3.  **The Secretary Reasonably Addressed Comments Identifying Purported Inconsistencies in its Interpretation of the Phrase "Entitled to Benefits" in the DSH Statute**

Plaintiffs also argue that the 2013 Rule was arbitrary and capricious due to HHS's failure to "adequately respond to comments about its inconsistent interpretation of the same phrase 'entitled to benefits' within a single sentence of the DSH statute." Pls.' MSJ at 42. The Secretary responds by contending that these comments did not raise "significant" problems, meaning he had no obligation to respond, but that nonetheless the agency's response was more than adequate. Def.'s MSJ at 36. The Court agrees and finds that the Secretary's response and explanation for the interpretive differences in the phrase in question was reasonable, and thus sufficient to meet the agency's obligations under the APA.

Agency action will be considered arbitrary or capricious unless an "agency adequately . . . respond[s] to relevant and significant public comments." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011) (citation omitted) (alteration added). Plaintiffs contend that the internal inconsistency in statutory interpretation that was raised by commenters is one such "significant" public comment that was not adequately addressed. Pls.' Reply at 28. *See, e.g., Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.") (collecting cases); *Util. Air Regul. Grp. v. EPA*, 885 F.3d

_____

classified as a small entity. Absent a factual showing in this respect, the Court cannot let this claim proceed. Plaintiffs also invoke *Nw. Min. Ass'n v. Babbitt*, but this case is inapposite. The *Babbitt* court found that the plaintiff could bring suit under RFA as a "small organization" because the agency did "not contest" the plaintiff's claims that it met the statutory requirements to qualify as a "small organization." *Nw. Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998). But no such agreement has been reached here, where the Secretary continues to dispute this issue, Def.'s Reply at 19, rendering Plaintiffs' request for summary judgment inappropriate. *See* Fed. R. Civ. P. 56 (limiting grant of summary judgment to when a "movant shows that there is no genuine dispute as to any material fact")

714, 723 (D.C. Cir. 2018) (noting that "inconsistent treatment is the hallmark of arbitrary agency action.") (quoting *Catawba Cnty. v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009)); *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994) (explaining that an "unexplained inconsistency" in a final rule was "not reasonable"). While an agency's response to significant public comments must do more than simply "[n]od[] to concerns raised by commenters only to dismiss them in a conclusory manner," *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), this obligation "is not 'particularly demanding,'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). An agency's response will be considered adequate where it "'enable[s] [the court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Public Citizen*, 988 F.2d at 197 (quoting *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 335 (D.C. Cir. 1968)).

The alleged inconsistency in the Secretary's interpretation of the phrase "entitled to benefits" can be found in the language of the DSH statute that defines the numerator of the Medicare fraction. As a reminder, the Medicare fraction is defined as the number of patient days for individuals both "entitled to benefits under part A" and "entitled to SSI benefits," divided by the total number of patient days for patients "entitled to benefits under part A." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). When determining if an individual is "entitled" to Medicare Part A benefits, the Secretary's interpretation includes all patients that meet the statutory criteria for this entitlement, even if they have opted for a Medicare Part C plan such that their hospital services will be paid by their Part C plan. *See* Pls.' MSJ at 43. In contrast, patients are only considered to be "entitled" to SSI benefits when they are both eligible for this entitlement and Social

Security actually makes the payment.[18]  *Id.*  This "contradictory interpretation," as characterized by Plaintiffs, *id.*, was noted by several commenters.  *See* RR at 8, 22, 29, 170, 441, 852, 958, 1184, 1199, 1228, 1242.

The parties first engage in a threshold argument on the issue of whether this inconsistency rises to the level of presenting a "significant" problem with the rulemaking, necessitating an agency response.  Unsurprisingly, Plaintiffs are adamant that it does rise to this level, highlighting how "[a]t least a dozen commenters" noted the issue during the comment period.  Pls.' Reply at 28.  In response, the Secretary argues that the cited comments "are just verbatim copies of the same three-sentence 'comment'" and that the identified inconsistency does not actually have any bearing on the Part C days issue that is the focus of this action.  Def.'s Reply at 21.  The Secretary's rationale for why Part C days are not actually implicated by this inconsistency is rather opaque and difficult to follow.  *See* Def.'s MSJ at 36.  However, the Court need not reach this issue at this time, given that the Secretary provided a satisfactory response to these comments within the text of the 2013 Rule.

First, Plaintiffs do not dispute—nor could they, reasonably—that the Secretary responded to this concern within the text of the 2013 Rule, where the agency both identified the interpretation inconsistency highlighted in the dozen or so comments, and provided an explanation for this discrepancy as to when someone can be classified as being "entitled to benefits" under Medicare Part A and SSI.  *See* 78 Fed. Reg. at 50,617.  The Secretary noted that he "disagree[d]" with the suggestion that the interpretation was unreasonable and inconsistent,

---

[18] For example, under the Centers for Medicare & Medicaid Services ("CMS") current interpretation of the phrase, a patient is not "entitled to" SSI benefits if they are eligible for the coverage but for some reason, such as a lack of valid current address for payment, the agency does not actually make the payment owed to the individual.  *See* RR at 8 (citing 75 Fed. Reg. 50,042, 50,280 (Aug. 16, 2010)).

explaining that, "because SSI is a cash benefit, only a person who is actually paid these benefits can be considered entitled to these benefits." *Id.* According to the agency, "entitlement to SSI benefits," therefore, "differs from entitlement to Medicare benefits under Part A, which are a distinct set of health insurance benefits." *Id.* The response also referenced another rulemaking, where the Secretary had addressed this same issue in greater depth. *Id.* (citing 75 Fed. Reg. 50,280–50,281 (examining statutory language and explaining how eligibility for SSI "does not automatically mean that an individual will receive SSI benefits for a particular month," and contrasting this with Medicare Part A, an entitlement that an individual retains even when "there was no Medicare Part A coverage of a specific inpatient stage")); *see also New Lifecare Hosps. of Chester Cty. LLC v. Azar*, 417 F. Supp. 3d 31, 44 (D.D.C. 2019) (finding HHS appropriately responded to significant comments by referencing prior rulemaking on same topic). The Secretary consequently contends that this explanation considered the concern raised by commenters, before reasonably rejecting this position on the basis of the explanation provided, and that no more was required. *See* Def.'s Reply at 22.

Plaintiffs thus challenge not the existence but rather the adequacy of the Secretary's response, calling the proffered distinction "nonsensical," Pls.' MSJ at 44, and an example of "conclusory and circular reasoning," Pls.' Reply at 29. They argue that because "[b]oth the Medicare [P]art A and SSI programs grant beneficiaries the right to have payment made in their name," whether the payments are made directly to an SSI beneficiary or in the case of Medicare Part A, to a representative payee on the beneficiary's behalf, the payments under both programs are essentially the same. Pls.' MSJ at 44. As a result of this explanatory deficiency, Plaintiffs contend that the Secretary has failed to provide the required "reasoned response" to these significant comments, rendering the 2013 Rule arbitrary and capricious.

The Court is not convinced.  First, again, the record clearly shows that the Secretary responded to these comments in a way that showed what issues were considered and "why the agency reacted to them as it did."  *See New Lifecare Hosps.*, 417 F. Supp. 3d at 43–44 (citations omitted); *see also Cooper Hosp. / Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 54 (D.D.C. 2016) (noting that "all that the [APA] requires" is a "response [that] demonstrates that the agency considered and rejected the arguments of [plaintiffs.]") (first two alterations added, third and fourth in original).  Nor would the Court characterize the substance of the Secretary's response as "conclusory," despite Plaintiffs' attempt to argue otherwise.  *See* Pls.' Reply at 29. The Secretary explained that the perceived inconsistency is attributable to the two distinct types of statutory entitlements at issue—SSI cash benefits vs. Part A insurance benefits.  SSI cash benefits are a type of entitlement that "depends on a right to be paid," while one's insured status is a continuous entitlement, that is not contingent on certain payments being made each month. *See* 78 Fed. Reg. at 50,617.  While Plaintiffs attempt to gloss over this distinction by positing that both programs really just involve a "right to payment in [one's] name," Pls.' Reply at 30, this ignores the differences the Secretary highlights regarding the methods of qualifying for each type of entitlement and the scope of the coverage each program entails, meaning that the contours of who is "entitled to" SSI benefits compared to Part A coverage reasonably varies. Particularly in light of the Court's obligation "to afford great deference to the Secretary's expertise in implementing" the Medicare statute, *Cape Cod Hosp.*, 630 F.3d at 216 (quoting *Methodist Hosp.*, 38 F.3d at 1229), the Court holds that Plaintiffs have fallen short of their burden to show that the Secretary's explanation was arbitrary and capricious.

Furthermore, the available case law also supports the Secretary's position.  For example, on a more general level, it is not unprecedented that "[a] given term in the same statute may take

on distinct characters from association with distinct statutory objects calling for different implementation strategies." *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007); *see also Allina Health Sys. v. Sebelius*, 982 F. Supp. 2d 1, 11 (D.D.C. 2013) (noting that "as the Supreme Court has observed, varying interpretations, even within the same statute, do not irrefutably render an agency construction unreasonable") (citation omitted). More specifically, this same alleged inconsistency in statutory interpretation has been challenged in other contexts and survived judicial review. Indeed, the Sixth Circuit confronted this question head on in *Metropolitan Hospital v. U.S. Dep't of Health & Human Servs.*, in the context of the Secretary's treatment of exhausted coverage days. 712 F.3d 248, 268 (6th Cir. 2013). The Court concluded that "the differences in the language used in the SSI and Medicare statutory schemes explain this apparent inconsistency." *Id.* Plaintiffs weakly attempt to argue we should ignore the majority's holding and side instead with the "blistering" dissent. Pls.' Reply at 32. But the dissent at issue did not even address this inconsistency argument, and disagreed with the majority on the grounds that binding Sixth Circuit precedent required rejecting the Secretary's interpretation under *stare decisis*. *Metro Hospital,* 712 F.3d at 270 (McKeague, J., dissenting).[19] In sum, the Court

---

[19] Plaintiffs also invoke then-Judge Kavanaugh's concurrence that briefly touched on this topic in *Northeast Hospital*, where he posited that "[t]he only thing that unifies the Government's inconsistent definitions of this term is its apparent policy of paying out as little money as possible." 657 F.3d at 20 n.1; *see also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984) (noting that "[i]t would be arbitrary and capricious for [the agency] to bring varying interpretations of the statute to bear, depending upon whether the result helps or hurts Medicare's balance sheets"). The Court is not persuaded that this offhand comment, made in a footnote in support of an argument the majority of the D.C. Circuit rejected, is enough to convince it to ignore *Metropolitan Hospital.* Indeed, despite this same argument being raised again in the briefing in *Catholic Health*, including with this same citation to then-Judge Kavanaugh's concurrence, the D.C. Circuit appeared to implicitly reject this argument in its holding on this issue. *Catholic Health*, 718 F.3d at 920 (citing *Metro. Hospital* approvingly and finding the Secretary's interpretation of "entitled to benefits under part A" to be "the better one").

concludes that the Secretary properly addressed comments about the alleged "inconsistency" in the statutory interpretation of the Medicare fraction in the 2013 Rule such that the agency did not act in an arbitrary or capricious manner.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and the Secretary's cross-motion for summary judgment is granted. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 7, 2021
RUDOLPH CONTRERAS
United States District Judge